# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **WENDY HANCOCK, individually and** | ) | |
| **as next friend for B.B.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:19-cv-00060** |
| | ) | |
| **DEANDRA MILLER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This litigation arises from a dispute between Wendy Hancock and the Tennessee Department of Children's Services ("DCS") that resulted in Hancock's two children being placed in temporary foster care. Hancock, acting on behalf of herself and her minor daughter ("B.B."), sues seventeen defendants under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, as well as a variety of Tennessee tort claims, and seeks a declaratory judgment of a state court order. Defendants have filed five motions to dismiss (Doc. Nos. 33, 50, 61, 74 and 76) that are ripe for review. For the following reasons, this case will be dismissed.

I.     <u>Legal Standard and Motions Concerning Exhibits</u>

It is well established that to survive a Rule 12(b)(6) motion:

- the complaint must aver facts that plausibly state a claim;

- the plausibility standard is not a probability or conceivability standard;

- the complaint must state a claim under the law;

- legal conclusions in the complaint are not factual allegations; and

- factual allegations in the complaint must be accepted as true without unreasonable factual inferences.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)); Lutz v. Chesapeake Appalachia, L.L.C., 717 F.3d 459, 464 (6th Cir. 2013).

Defendants ask the Court to consider several public records exhibits that are the subject of two Motions to Exclude by Hancock. In the first motion, Hancock argues that the documents must be excluded because they are confidential. (Doc. No. 84.) Defendants, however, have provided an order from the DeKalb County Circuit Court specifically permitting the use of these records under seal in this case (Doc. Nos. 99-1 and 115-1), and certified copies of the records from the Circuit Court Clerk of DeKalb County (Doc. Nos. 53-56; 63-69). In the second motion, Hancock contends the exhibits should be excluded under Federal Rule of Evidence 201 because they are not "final orders" or because Hancock appealed at the state court level, as well as excluded because Hancock's custody proceeding was eventually dismissed. (Doc. No. 119.) However, Hancock offers no authority (or even reasoned argument) in support of these propositions. (See id.) Defendants respond that the exhibits may be nonetheless considered under controlling authority. (Doc. No. 121.) Federal Rule of Evidence 201, which governs judicial notice, contains none of the restrictions Hancock suggests. See Fed. R. Evid. 201. It specifies that the Court may take judicial notice of facts not subject to reasonable dispute that are (1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The certified copies of court records challenged by Hancock meet these criteria. Further, the records are directly relevant to the First Amended Complaint. (See Doc. No. 34.) Hancock's motions to exclude will be therefore denied. See, e.g., Barany-Snyder v. Weiner, 539 F.3d 327, 332 (6th Cir. 2008) (matters of public

record may be considered on a motion to dismiss if integral to the First Amended Complaint); Wyser-Pratt Mgmt. Co., Inc., v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005) ("In addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.").

Hancock separately moves to exclude another public record exhibit attached by Defendants Collins and Williams – the Standing Order for Designation of Substitute Judge (Doc. No. 74-1) ("Standing Order") – because she argues there is no evidence it was ever officially filed. (Doc. No. 90 at 2-3.) This motion will be denied because other Defendants filed a stamped certified copy of the same exhibit, providing that very evidence (see Doc. No. 69), and Collins and Williams have filed a Motion to Allow Substitution of a Stamp-Filed Copy to replace the inadvertently-filed unstamped copy (Doc. No. 86). The Defendants' motion to substitute will be granted. This exhibit is also directly relevant to the allegations in the First Amended Complaint. The Court will consider it and deny Hancock's motion to exclude.

II.    Factual Allegations[1]

Hancock resided in DeKalb County, Tennessee with two minor children. She alleges a conflict between her family and DCS dating back to 2010. This conflict arose when Hancock became active in the grassroots movement for child welfare reform, including "seeking accountability of [DCS] employees" and the exposure of "perverse financial incentives." (Doc. No. 34 ¶ 32.) She joined social media groups, including the "Family Forward Project" on

---

[1] The 53-page First Amended Complaint is a disorganized, conclusion-laden narrative that falls way short of the "short and plain statement" envisioned by Federal Rule of Civil Procedure 8. The Court does not repeat every factual allegation, but only those allegations, accepted as true, necessary to resolve the motions to dismiss. Iqbal, 556 U.S. at 678.

Facebook, whose members posted stories unfavorable to state child welfare agencies and the foster care system.

In May 2017, Deandra Miller ("D. Miller"), a Dekalb County DCS caseworker, contacted Hancock to inform her that there was a referral against her that DCS needed to investigate. DCS did not pursue this referral.

In October 2017, Hancock's minor son was punished by both his school and the Dekalb County Juvenile Court ("Juvenile Court") for misbehavior. D. Miller visited Hancock but did not make personal contact with her and would not discuss the matter with Hancock's attorney.

On August 6, 2018, Hancock filed an unruly petition against her minor son. That same day, Hancock's son called the police to the Hancock home, during which visit the police found drug paraphernalia in the son's room. On August 7, Hancock's son left the home after an argument with Hancock. On August 8, D. Miller contacted Hancock regarding another DCS referral against her for abuse and neglect. That same day, Hancock went to the Smithville Police Department to report her son as missing.

On August 10, unbeknownst to Hancock, her son's father, who is estranged from Hancock, contacted D. Miller and arranged to bring his son into DCS. At the meeting, Hancock's son complained about verbal and physical mistreatment by Hancock, stated he was afraid to go home, displayed evidence of abuse, and reported Hancock's drug and alcohol use. DCS took possession of Hancock's son. That same day, Smithville Police called Hancock and told her that she had to come to the police station to receive important information about her son. Again, Hancock's attorney instructed Smithville Police not to speak to Hancock without counsel. Also on August 10, DCS contacted the office of Juvenile Court Judge Bratten Hale Cook to request an *ex parte* order against Hancock. Judge Cook did not consider the request due to his familiarity with Hancock.

The same day Smithville Police obtained criminal warrants against Hancock for assault and contributing to the delinquency of a minor.

On August 13, without contacting Hancock or her attorney, D. Miller presented a verified DCS petition to Smith County General Sessions Judge Michael Collins. Hancock alleges that Judge Collins was without jurisdiction. However, a "Standing Order for the Designation of Substitute Judge," by Tennessee Supreme Court Chief Justice Jeffrey S. Bivins provides if Judge Cook "is unavailable or recuses himself for any reason on any case, then, in the interest of the efficient and orderly administration of justice, the Chief Justice, exercising his statutory and inherent power pursuant to Title 17, Part 2, Sections 201, 202 and 208 of the provisions of the Tennessee Code Annotated, and Rule 11 of the Rules of the Supreme Court, hereby designates and assigns the following current or retired judges to exercise such jurisdiction, subject to the availability and consent of such judge . . . ." (Doc. No. 86-1 at 1.) The list of judges includes "Honorable Michael Collins, Smith County General Sessions Judge." (Id.) The DCS petition contained numerous, detailed allegations concerning Hancock's parental behavior based on statements of her son and others. Hancock alleges that the DCS petition was fabricated to obtain an *ex parte* order to remove her children and it "falsely claimed" that she was a "drug dealer, drug addict, and was physically abusive to her children." (Doc. No. 34 ¶ 51.)

Judge Collins entered an *ex parte* Protective Custody Order (the "*Ex Parte* Order") that concluded there was no less drastic alternative available than to grant DCS immediate temporary custody of Hancock's children. (Doc. No. 64.) The Court appointed Sarah Cripps guardian *ad litem* for the children. According to Hancock, there was "no evidence" that B.B. was an endangered child. (Doc. No. 34 ¶ 57.) However, she believes that Smithville Police worked with D. Miller to "trap" her with a warrant so that her children could be taken from her by DCS. (Id.)

On August 15, in an attempt to locate Hancock and B.B., D. Miller, Smithville Detective James Cornelius, and Cookeville-based DCS attorney Tracy Hetzel retrieved images of Hancock and B.B. from Hancock's Facebook profile and publicly broadcast them on the national child alert system, identifying Hancock as a criminal defendant and B.B. as an "endangered child." (Id. ¶ 58.) Cornelius and DCS allegedly made no effort to contact Hancock's attorney.

On August 16, Hancock was arrested and B.B. was taken into DCS custody. Hancock was interrogated without her attorney. Her statements were used against her in juvenile and criminal court proceedings. (Id. ¶ 60.) At the subsequent hearing, Judge Collins agreed to recuse himself.

On August 17, both children were placed in the foster home of Fanetha Sneed, who provided foster care services through Keys Group,[2] which held a contract with DCS to provide housing and care of children removed from parents. While in Sneed's foster care, D. Miller and DCS Dekalb County Family Services Worker Angela Brown arranged for the children to receive the HPV vaccine,[3] without Hancock's knowledge, under authority granted in the *Ex Parte* Order.

The children remained with Sneed from August 17 through September 13. Hancock attempted to visit, but was only allowed to see B.B. On September 14, D. Miller and Cripps visited the Sneed home. The children complained to them about the living conditions, including insufficient food and poor sleeping conditions. Hancock further alleges that Sneed was emotionally

---

[2] Keys Group Holdings, LLC is the remaining defendant, after Plaintiffs' voluntarily dismissed Keys Group of Memphis, LLC that was never served with summons. (Doc. No. 120.)

[3] HPV, or human papillomavirus, is a common virus that can lead to 6 types of cancers later in life. Nearly 80 million Americans are currently infected with some type of HPV. See Centers for Disease Control and Prevention, About HPV, https://www.cdc.gov/hpv/parents/about-hpv.html. The U.S. Centers for Disease Control recommend that "[a]ll boys and girls need two doses of the HPV vaccine at ages 11-12 to protect against certain types of cancer." See Centers for Disease Control and Prevention, Vaccine for HPV, https://www.cdc.gov/hpv/parents/vaccine-for-hpv.html.

abusive to the children, and that the children were exposed to adults drinking alcohol and smoking marijuana. Wendolyn Miller ("W. Miller"), the Keys Group foster care supervisor, was allegedly aware of these circumstances. The children later reported that there were "fights every day" and they felt like "outcasts" because they were white and inserted into a predominantly African-American community. (Id. ¶ 62.)

On the same day they complained – September 14 – B.B. and her brother were moved to the home of Easter Williams, who also provided foster care services through Keys Group. This time, Hancock's son was able to speak with D. Miller within a day to report that the home was unacceptable and Williams did not provide the children beds – i.e., B.B. was required to sleep on the couch and her brother on the floor. The children allegedly told D. Miller about alcohol and needles in the home, and that an unknown man lived in the home who would come home drunk and fight with Williams. The children also claimed that Williams allegedly threatened to hit Hancock's son, refused the children permission to use the phone, and told them she did not have money to buy gas to travel or to buy them food. D. Miller inspected the Williams' home and found a cluttered and dirty house, roaches crawling in the kitchen, medicine bottles accessible to children, bottles of champagne on tables in the living room, and one of Williams' children drinking a beer.

In mid-September, the children were moved to the home of Christa Wilson, another foster parent that, like the other foster homes, the children found to be problematic. Wilson's home allegedly operated more like a group home.

The state dismissed the assault charge against Hancock in November 2018. Hancock's son was placed on probation. In December 2018, on the advice of counsel, Hancock sought a psychological evaluation. She completed a detoxification program on February 7, 2019.

In January 2019, the children received psychological evaluations, but Hetzel, D. Miller, Cripps, and Brown refused to produce the records to Hancock and her attorney. Hancock alleges that Cripps coerced B.B., under threat of never going home, to change previously positive testimony about Hancock (i.e., that she neither feared her mother nor believed her mother had harmed her or placed her in danger) to testify as Cripps wanted. Specifically, Hancock believes that Cripps "demonized" Hancock's boyfriend until B.B. believed that the boyfriend would murder B.B. if she went back home. (Id. ¶ 84.) When B.B. was called to the witness stand in February 2019, she changed her testimony and stated she did not want to return home until Hancock completed a reunification plan. Hancock also alleges that Cripps withheld from the Court that B.B. had stated in October 2018 that she wanted to go home. Hancock alleges that DCS believed the children should never be returned home despite the stated goal of reunification.

In February 2019, Hancock cooperated with a twelve-substance nail bed drug test, which is sensitive to the presence of substances for the past 8-12 months. (Id. ¶ 81.) There was only a slight indication for the active ingredient in marijuana, but it was too small to register as positive. Nevertheless, her children were not returned home.

By May 2019, Hancock began sending complaints about Hetzel, D. Miller, Brown, and the foster parents directly to the Commissioner of DCS, who acknowledged receipt but took no action. Hancock cooperated with another psychological evaluation in May. Hetzel, D. Miller, Cripps, and Brown still refused to allow the children to return home. During the course of all of these events, Hancock and B.B. allegedly suffered great emotional and psychological distress, and the children were led to believe they would never be reunited with their mother.

Hancock discussed the actions of Defendants on social media, including publishing live videos on the Family Forward Project Facebook page and sharing them widely throughout the

child welfare reform community, allegedly outraging Hetzel, Cripps, D. Miller, Brown, R. Williams, and Judge Collins. Hetzel and Cripps moved for a gag order in November 2018, and it remained in place until February 2019. Hancock alleges that during this time and afterwards, Cripps, Hetzel, Judge Collins, and others made negative statements about and to Hancock and her children as retaliation for defending parental rights, and as a barrier to family reunification. (Id. ¶¶ 86-87.)

Throughout the course of foster care placement, the Juvenile Court determines the safety and appropriateness of care through the Foster Care Review Board ("FCRB"). The FCRB met concerning the placement of Hancock's children on November 8, 2018, December 4, 2018, February 5, 2019, May 7, 2019 and June 4, 2019. Hancock alleges that in various ways she was subject to retaliation by the FCRB.

On June 3, 2019, Hancock's children were returned home. The Circuit Court and Juvenile Court of Dekalb County entered orders finding that Hancock had "completed all tasks required of her" and dismissing the custody case. However, on July 19, 2019, Hancock was arrested for custodial interference based on the *Ex Parte* Order.

III.    Analysis

A.      Section 1985 Claims Against All Defendants

A Section 1985 claim requires that the accused conspirators enter the conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." Vakilian v. Shaw, 335 F.3d 509, 518 (6th Cir. 2003) (quoting United Bd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983)) (internal quotation marks omitted). For each defendant, the plaintiff must allege "that the alleged conspirators *shared* a common discriminatory objective." Pahssen v. Merrill Cmty. Sch. Dist., 668 F.3d 356, 368 (6th Cir. 2012)

(emphasis in original).[4] The threshold question is whether Hancock has pled that Defendants' concerted actions were motived by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." Vakilian, 335 F.3d at 519 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). She has not.

The First Amended Complaint contains no allegation that any Defendant was motivated by class-based animus or that any Defendant treated Hancock or B.B. differently on a class basis. Hancock believes that Defendants engaged in "concerted efforts to obtain secret court orders, assault the children with inoculation, repeatedly place the children in strange and dangerous environments, stonewall the reunification process, First Amendment retaliation (intimidation), and total obliteration of procedural and substantive due process," for the purpose of "the destruction of the family rights of the Plaintiffs." (Doc. No. 34 at 49.) This at best ascribes to Defendants personal bias against Hancock because they believed she was not fit to have custody of her children. None of these allegations involve a class protected under the Equal Protection Clause. See Vakilian, 335 F.3d at 519 ("A class protected by [Section 1985] must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender.") (quoting Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc., 32 F.3d 989, 994 (6th Cir. 1994)).

---

[4] Hancock has conceded that the Section 1985 claim against W. Miller and Keys Group should be dismissed. (Doc. No. 88 at 12.) Hancock avoids responding to the remaining Defendants' argument. She also claims to bring a Section 1983 claim for civil conspiracy based on the exact same three sentences that the First Amended Complaint explicitly states to be the Section 1985 claim. (See Doc. Nos. 48 at 15-18; 93 at 36.) As multiple Defendants correctly indicate, however, what Hancock now purports to be both a Section 1983 civil conspiracy claim *and* a Section 1985 conspiracy claim is pled as *only* a Section 1985 claim. (See Doc. No. 34 at 49 ("The defendants are liable in their concerted and collective actions to violate constitutional rights under 42 U.S.C. Sec. 1985.").) Any purported Section 1983 civil conspiracy claim is absent from the First Amended Complaint, insufficiently pled, and the Court does not discuss it further.

The First Amended Complaint makes a passing reference to race when describing that B.B., as an "Anglo, Protestant, political conservative," felt like an "outcast" in an African-American foster home, in "a public school that was predominantly African-American," and in the "not . . . culturally appropriate" location of Madison County, Tennessee. (Doc. No. 34 ¶¶ 29, 62, 71.) However, none of these allegations suggest that any of the Defendants acted with a discriminatory *purpose* in putting B.B. in that foster environment, let alone that all Defendants shared that motivation. Because there are no allegations that Defendants conspired with the required discriminatory intent, Hancock's Section 1985 claim must be dismissed. See, e.g., Pahssen, 668 F.3d at 368 (lack of required discriminatory animus "dooms [a] § 1985 claim").

B.      Section 1983 Claims

1.      Ninth Amendment Claims

Hancock alleges a claim under Section 1983 for violation of the Ninth Amendment. However, "[t]he Ninth Amendment does not confer substantive rights in addition to those conferred by other portions of our governing law." Gibson v. Matthews, 926 F.2d 532, 537 (6th Cir. 1991). Hancock's Ninth Amendment claims therefore "hold[ ] no merit," id., and are not "plausible on [their] face." Iqbal, 556 U.S. at 678. They will be dismissed.

2.      Eighth Amendment Claims

Hancock alleges claims under Section 1983 for violation of the Eighth Amendment. However, the Eighth Amendment does not apply to children in foster care. It forbids only the "cruel and unusual" punishment of "a sentenced inmate." Bell v. Wolfish, 441 U.S. 520, 535 n.16-17 (1979). Thus, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977). Instead of Eighth Amendment protections, children

have substantive due process rights under the Fourteenth Amendment "to be free from the infliction of unnecessary harm . . . in state-regulated foster homes." <u>Meador v. Cabinet for Human Res.</u>, 902 F.2d 474, 476 (6th Cir. 1990); <u>see also</u> <u>Lintz v. Skipski</u>, 25 F.3d 304, 305 (6th Cir. 1994) (noting this principle is clearly established and collecting cases). Because Hancock's Eighth Amendment claims concern the treatment of B.B. in foster care, they are not "plausible on [their] face." <u>Iqbal</u>, 556 U.S. at 678. These claims will be dismissed.

### 3.   Fifth Amendment Claims

Hancock brings Section 1983 claims against Lieutenant Matthew Holmes and Detective James Cornelius for violating her Fifth Amendment rights during her second interrogation. During Hancock's first interview, Cornelius read her <u>Miranda</u> rights.[5] (Doc. No. 34 ¶ 42.) In the second interrogation, Cornelius and Holmes did not; instead, Cornelius asked Hancock if she knew her rights and relied on her answer, "yeah." (<u>Id.</u> ¶ 60.) Hancock alleges that statements from her second interrogation were "used to prosecute her in Juvenile Court and are now being used against her in criminal court." (<u>Id.</u>) This allegation is an insufficient basis for a Fifth Amendment claim.

The Fifth Amendment requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Police officers can be held liable under Section 1983 for violating someone's Fifth Amendment rights during an interrogation. <u>McKinley v. City of Mansfield</u>, 404 F.3d 418, 437 (6th Cir. 2005). However, "[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs *only at trial*." <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 264 (1990) (emphasis added) (citations omitted). In short, it is not until

---

[5] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

the use in a criminal trial of statements compelled by improper police interrogations that a violation of the Self-Incrimination Clause occurs. Chavez v. Martinez, 538 U.S. 760, 767 (2003); see also Withrow v. Williams, 507 U.S. 680, 692 (1993) (describing the Fifth Amendment as a "trial right"); United States v. Calvetti, 836 F.3d 654, 662 (6th Cir. 2016) ("The Fifth Amendment privilege against self-incrimination, however, "is a fundamental *trial right* of criminal defendants." (emphasis in original) (quoting McKinley, 404 F.3d at 437).

Thus, juvenile court proceedings against Hancock do not implicate her Fifth Amendment criminal trial right. Indeed, in Baltimore City Department of Social Services v. Bouknight, the Supreme Court made clear that "the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." 493 U.S. 549, 556 (1990). This includes "a broadly directed, noncriminal regulatory regime governing children cared for pursuant to custodial orders," because the state's efforts do not "focu[s] almost exclusively on conduct [that is] criminal." Id. at 559-61 (internal quotations omitted). Here, Hancock's second interrogation took place after she and B.B. were apprehended pursuant to the *Ex Parte* Order. The Juvenile Court proceedings, unlike any criminal case, were for the purpose of providing for the custody and care of Hancock's children.

Further, Hancock makes no allegation that any statements from the second interrogation have been admitted as testimony against her at a criminal trial. Indeed, she cannot because the two original criminal charges against Hancock never went to trial – i.e., the assault charge was dismissed and Hancock entered a "best interests" plea to the charge for contributing to the delinquency of a minor, expressly waiving her right to a trial. (Doc. No. 61-1.) Accordingly, Hancock has not alleged sufficient facts to make her Section 1983 Fifth Amendment claim against Holmes or Cornelius "plausible on its face." Iqbal, 556 U.S. at 678. These claims will be dismissed.

4.    <u>Certain Defendants Are Not State Actors</u>

Section 1983 applies only to persons acting "under color of" state law, 42 U.S.C. § 1983; <u>Wittstock v. Mark A. Van Sile, Inc.</u>, 330 F.3d 899, 902 (6th Cir. 2003), and "does not address purely private conduct, even if the conduct is discriminatory or wrongful," <u>Cannistra v. Rodriguez</u>, No. 1:18-cv-00078, 2018 WL 5777356, at *2 (M.D. Tenn. Nov. 2, 2018). The "under color of state law" requirement is satisfied if the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982).

a.    <u>Sarah Cripps</u>

Hancock alleges Section 1983 violations occurred while Cripps was acting as B.B.'s guardian *ad litem*. Cripps contends that these claims must be dismissed because a guardian *ad litem* is not a state actor and is immune from liability. (Doc. No. 33 at 5-7.) Cripps is correct.

"Although appointed by a court, a guardian *ad litem* . . . is not a state actor, because [s]he represents the best interests of the individual, . . . not the state." <u>Bracey v. Barbour</u>, No. 3:12-cv-629, 2012 WL 2395171, at *8 (M.D. Tenn. June 25, 2012) (collecting cases); <u>see also</u> <u>Reguli v. Guffee</u>, 371 F. App'x 590, 601 (6th Cir. 2010) ("Where the guardian reports to the court, she reports as an independent investigator. Where the guardian acts as an advocate of the child, she occupies a role distinct from the court before which she advocates."); <u>Cannistra</u>, 2018 WL 5777356, at *2 ("The Sixth Circuit has expressly recognized that . . . when a guardian reports to the court as an independent investigator, or acts as an advocate for the child, she is not a state actor for purposes of § 1983."); <u>Jenkins v. Whitley</u>, No. 1:06-cv-34, 2007 WL 954193, at *4 (E.D. Tenn. Mar. 27, 2007) (holding "Tennessee and federal courts, however, have made clear that a guardian *ad litem* . . . does not act under color of state law or as a state actor for purposes of § 1983.")

Hancock concedes that Cripps was appointed by the state court pursuant to state court rules for the purpose of representing B.B.'s interests and making recommendations to the court. (Doc. No. 48 at 9-10.) Citing one case from the Fourth Circuit and one case from a Missouri state court, Hancock nonetheless suggests that the Court should find Cripps to be a state actor because Cripps had a "state-appointed obligation to protect the due process interest of the child." (Id. at 8-10.) These cases, however, are not analogous. <u>Thomas S. v. Morrow</u>, 781 F.2d 367 (4th Cir. 1986), involved guardianship over a mentally incompetent ward committed to a mental institution, and the decision turned on North Carolina statutes that give the guardian complete custodial authority over all aspects of the ward's life. <u>Id.</u> at 377. The court concluded that in those particular circumstances the guardian's authority was a "right or privilege created by the state." <u>Id.</u> <u>Cruzan v. Harmon</u>, 760 S.W.2d 408 (Mo. 1988), similarly involved the power of a guardian to care for an incapacitated ward in all aspects of life. <u>Id.</u> at 425. These holdings are not novel – indeed the Sixth Circuit has recognized that "a more expansive type of guardianship" might satisfy the state actor test. <u>Reguli</u>, 371 F. App'x at 601. But the court explained that this is not the case where a guardian *ad litem* is merely alleged to have "control over what happened to [a minor] in juvenile court proceedings," especially where there are no allegations that he or she had a "binding impact" on the outcome. <u>Id.</u> Here, Cripps is alleged to have been a typical court-appointed guardian *ad litem* in a DCS case, charged by the court with working to ensure that B.B.'s rights were protected. Cripps did not have the type of "expansive" control over B.B. that could recharacterize her as a state actor.

Hancock also suggests that the allegations of the First Amended Complaint are contrary to a duty of loyalty Cripps had to B.B. (Doc. No. 48 at 11.) But it is Cripps' alleged *role* that is determinative. Critically, Hancock has "not allege[d] any facts suggesting that the state exercised

power over [Cripps'] judgment." <u>Cannistra</u>, 2018 WL 5777356, at *3. In sum, as B.B.'s guardian *ad litem*, Cripps is not a state actor for purposes of Section 1983.

Even if Cripps somehow were a state actor, she is also absolutely immune from civil rights actions for damages under Section 1983. <u>Murray v. Williams</u>, No. 3:15-cv-284, 2016 WL 1122050, at *7 (E.D. Tenn. March 22, 2016) (citing <u>Briscoe v. LaHue</u>, 460 U.S. 325, 345 (1983)); <u>see</u> <u>Kurzawa v. Mueller</u>, 732 F.2d 1456, 1458 (6th Cir. 1984) (extending absolute immunity to guardians *ad litem*, and explaining that they fall "squarely within the judicial process" and must be able to function "without the worry of possible later harassment and intimidation from dissatisfied parents"); <u>Ismaiyl v. Brown</u>, No. 16-4308, 2018 WL 2273671, at *2 (6th Cir. Mar. 22, 2018) (affirming the district court's determination that a guardian *ad litem*, among other defendants, was immune from suit for damages). In short, as the Court of Appeals explained, "[a] failure to grant immunity would hamper the duties of a guardian *ad litem* in h[er] role as advocate for the child in judicial proceedings." <u>Kurzawa</u>, 732 F.2d at 1458. Hancock's Section 1983 claims against Cripps will be dismissed.

   b.  <u>Fanetha Sneed[6] and Christa Wilson</u>

Hancock brings Section 1983 claims against Sneed and Wilson arising from their action as B.B.'s foster parents. She alleges they each created a toxic foster home environment that traumatized her daughter. Sneed and Wilson contend that as foster parents they did not act under

---

[6] Although Sneed did not file her own motion to dismiss, it is not in the interests of judicial economy to dismiss the similarly situated Wilson, but not Sneed. Accordingly, the Court will *sua sponte* dismiss Sneed from this case. <u>See</u> <u>Melton v. Blankenship</u>, No. 08-5346, 2009 WL 87472, at *4 (6th Cir. Jan. 13, 2009) (affirming dismissal of nonmoving defendants when the district court determined that the complaint failed to state a valid claim); <u>see also</u> <u>Dietz v. Bouldin</u>, 136 S. Ct. 1885, 1891 (2016) ("[A] district court possesses inherent powers that are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.") (citation and internal quotation marks omitted).

color of state law for purposes of Section 1983. The Court must determine whether Hancock has alleged that either Sneed or Wilson, both foster parents licensed and paid by the state of Tennessee, are state actors. <u>Reguli</u>, 371 F. App'x at 600; <u>Brown v. Hatch</u>, 984 F. Supp. 2d 700, 708 (E.D. Mich. 2013).

The Sixth Circuit has explained:

> Though we have developed three separate tests for assessing whether a private entity is a state actor (the so-called "public functions test," the "state compulsion test," and the "nexus test"), the Supreme Court has made clear that all of our various "criteria" boil down to a core question: whether "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 (2001) (quoting <u>Jackson v. Met. Edison Co.</u>, 419 U.S. 345, 351 (1974)).

<u>Brent v. Wayne Cty. Dep't of Human Servs.</u>, 901 F.3d 656, 676 (6th Cir. 2018).

Unlike foster agencies that may be entangled with states, "[c]ourts have consistently held that the decisions of foster parents are not state action." <u>Anderson v. Nebraska</u>, 4:17-CV-3073, 2018 WL 3009115, at *8 (D. Neb. June 15, 2018) (collecting cases). For example, in <u>Brown v. Hatch</u>, the Court concluded that a foster parent was not a state actor despite being an agent of a foster care agency that was a state actor. 984 F. Supp. 2d at 708-09. Citing extensive authority, the court held that providing day-to-day foster care services was not an exclusive government function, the state was not involved in day-to-day decisions of the foster parent, and a close nexus was not established merely by a foster parent being licensed by the state or "receiving remuneration in exchange for providing foster care services." <u>Id.</u> Likewise, in <u>Howell v. Father Maloney Boys' Haven, Inc.</u>, Civil Action No. 3:18-CV-00192-GNS, 2020 WL 42892, at *6-7 (W.D. Ky. Jan. 3, 2020), another court in this circuit recently declined to find that a foster home was a state actor. In doing so, the court stressed that the foster home was "engag[ed] in the private function of providing

day-to-day care" and "d[id] not take part in the unquestionably public functions of the removal of children from their homes, the placement of those children in an appropriate environment, or the monitoring of foster homes." Id.; see also, e.g., Ismail v. Cty. of Orange, 693 F. App'x 507, 512 (9th Cir. 2017) ("Merely serving as a foster parent does not transform a private party into a state actor."); Leshko v. Servis, 423 F.3d 337, 345-46 (3d Cir. 2005) (rejecting application of a common law *parens patrie* duty and holding that foster parents are not state actors under Section 1983); United States v. Peneaux, 432 F.3d 882, 896 (8th Cir. 2005) ("[F]oster parents are generally not considered agents of the state."); Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1348 (11th Cir. 2001) (holding foster parents are not state actors under Section 1983); Weller v. Dep't of Soc. Servs., 901 F.2d 387, 392 (4th Cir. 1990) ("[H]arm suffered by a child at the hands of his foster parents is not harm inflicted by state agents.").

Hancock suggests that Brent has invalidated this entire body of caselaw and established "foster care as a state action," and that, as a result, there is a "distinction without a difference" between the foster care agencies in Brent and Sneed and Wilson. This is a gross misreading of Brent, which marked no such dramatic shift. Indeed, the conclusion that day-to-day foster parenting does not equate to state action is fully consistent with the acknowledgment in Brent that mere "state regulation . . . , even if it is extensive and detailed, is not enough to support a finding of state action." Brent, 901 F.3d at 677.

Here, Sneed and Wilson are alleged to have been parents in Tennessee's child welfare system who offered basic foster care services to Hancock's children at the direction of either Keys Group or DCS. (Doc. No. 34. ¶¶ 62, 65-67, 72-74.) It cannot be said that Sneed or Wilson "work[ed] together" with Tennessee to "manage [ ] children's custody and care" such that there is the required "close nexus" for a finding of state action. Brent, 901 F.3d at 677. Sneed and Wilson

18

are therefore not state actors for purposes of Section 1983. The claims against them will be dismissed.

5.    The *Rooker-Feldman* Doctrine Precludes Review of Claims Arising From the *Ex Parte* Order

The Rooker-Feldman doctrine, derived from Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), holds that lower federal courts lack subject matter jurisdiction to engage in appellate review of state court proceedings or to adjudicate claims that are "inextricably intertwined" with issues decided in state court proceedings.[7] Rooker-Feldman applies "when a plaintiff asserts before a federal district court that a state court judgment itself was unconstitutional or in violation of federal law," and courts apply the doctrine when a plaintiff complains of injury arising from the "state court judgment itself." McCormick v. Braverman, 451 F.3d 382, 395 (6th Cir. 2006); see Coles v. Granville, 448 F.3d 853, 858 (6th Cir. 2006). "The key inquiry in deciding whether Rooker–Feldman applies is determining the source of the plaintiff['s] alleged injury. "If the source of the injury is [a] state court decision, then the Rooker-Feldman doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." Reguli, 371 F. App'x at 595 (quoting McCormick, 451 F.3d at 393).

Two recent cases – both involving Hancock's counsel (Connie Reguli), here – demonstrate the application of Rooker-Feldman in circumstances analogous to this case. First, in Reguli v. Guffee, Reguli brought suit on behalf of herself and her daughter to complain of their treatment

---

[7] "Because Rooker-Feldman concerns federal subject matter jurisdiction, this court may raise the issue *sua sponte* at any time." Saker v. Nat'l City Corp., 90 F. App'x 816, 818 (6th Cir. 2004) (citing Franzel v. Kerr Mfg. Co., 959 F.2d 628, 630 (6th Cir. 1992)). Indeed, the Court has an obligation to "satisfy itself . . . of its own jurisdiction," particularly when constitutional claims are raised. Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541-42 (1986).

by DCS and the Williamson County Juvenile Court subsequent to Reguli filing an "unruly" charge. Reguli v. Guffee, No. 08-CV-0774, 2009 WL 425020, at *1 (M.D. Tenn. Feb. 19, 2009). Many of the constitutional claims asserted allegedly stemmed from actions arising from an order entered by the Juvenile Court Referee. Id. Reguli made numerous allegations of unlawful acts by the defendants surrounding the entry and enforcement of this order, including making the claim that the Juvenile Court had lost jurisdiction over the case. Id. at *2-4. Now-retired Judge Todd Campbell dismissed many of these claims pursuant to the Rooker-Feldman doctrine, holding that the claims "directly attack[ed]" the Juvenile Court Referee's ruling as unlawful. Id. at *8-9.

On appeal, the Sixth Circuit affirmed. It found that the orders issued by the Juvenile Court "were the state court decisions themselves." Reguli, 371 F. App'x at 597. It agreed that "[t]he majority of claims against the Williamson County defendants could be read as challenges to state court orders which are barred by the Rooker-Feldman doctrine." Id. at 595. The court held that Reguli's claims that the defendants conspired to *ex parte* deprive her and her daughter of their rights all alleged an injury that "is a direct result of the judicial order." Id. at 596. Further, it concluded that Rooker-Feldman applied to all if the Williamson County defendants "with equal force." Id.

In January 2020, Reguli was counsel in a similar case before Judge William L. Campbell, Jr., styled Cunningham v. Davenport, No. 3:19-cv-00501, 2020 WL 374413 (M.D. Tenn. Jan. 23, 2020). This time, the plaintiff was Reguli's daughter, who was suing on behalf of herself and her child (Reguli's grandchild). Id. at *1. This time, the defendants accused of multiple constitutional violations were the Rutherford County Juvenile Court Judge and several county-based DCS employees. Id. Again, the claims arose from the issuance of a Juvenile Court order. Id. The *ex parte* order in question found that DCS had been unable to complete an investigation due to the

actions of Cunningham and Reguli, and gave DCS and law enforcement the authority to conduct an investigation and take temporary custody of the child if necessary. Id. at *1-2. Judge Campbell concluded that "[a]s in Reguli, the main source of the injury [p]laintiff identifies in the Amended First Amended Complaint is based on the issuance of the *ex parte* order. Plaintiff claims her parental rights, due process rights, and her right to be free from an unreasonable search and seizure were all violated by the terms of the *ex parte* order. Thus, the Rooker-Feldman doctrine applies to those claims." Id. at *5.

Yet again here, Hancock's counsel, Connie Reguli, brings numerous claims directly arising from a Juvenile Court order. Hancock brings claims against multiple Defendants. As in Reguli and Cunningham, the majority of these claims arise from a state court decision – here, Judge Collins' *Ex Parte* Order, who made findings concerning the condition of Hancock's children, whether they were exposed to an immediate threat to their health and safety, and whether it was contrary to the children's welfare for them to remain in their mother's care pending further proceedings. (Doc. No. 54.) Based upon "emergency circumstances," the Court authorized the State of Tennessee and DCS to take temporary custody of the children; to care for the children, including providing any necessary medical care; and to communicate with the children's guardian *ad litem*. (Id.)

Judge Collins' *Ex Parte* Order is the "main source of injury" for all of Hancock's claims related to the pursuit, seizure, and retention of her children by DCS and state authorities, as well as the alleged interference with Hancock's parental rights by means of those actions. Specifically, Hancock makes: (a) Fourth Amendment claims concerning the seizure of the children pursuant to the *Ex Parte* Order; (b) Fourteenth Amendment procedural due process claims concerning removing the children pursuant to the *Ex Parte* Order and participating in hearings pursuant to the *Ex Parte* Order; (c) Fourteenth Amendment substantive due process claims concerning removing

and retaining the children pursuant to the *Ex Parte* Order, including a claim based upon the provision of the HPV vaccine to B.B. under the medical treatment provision of the *Ex Parte* Order. Because these claims can be read – and, indeed, are repeatedly framed by Hancock as – direct challenges to the substance and authority of the *Ex Parte* Order, the jurisdiction of the Court to entertain them is precluded by the <u>Rooker-Feldman</u> doctrine.

This conclusion holds true even in the face of Hancock's repeated contention that the *Ex Parte* Order was entered without proper jurisdiction. In both <u>Reguli</u> and <u>Cunningham</u>, the plaintiff made the same argument that <u>Rooker-Feldman</u> did not govern because the order in question was issued without jurisdiction and invalid. <u>See</u> <u>Reguli</u>, 371 F. App'x at 597; <u>Cunningham</u>, 2020 WL 374413, at *5. Twice that argument was flatly rejected. The Court of Appeals held that it could not consider whether the state court order was unconstitutional; "[e]ven if issued without jurisdiction, the order was still issued by a state court"; and <u>Rooker-Feldman</u> nonetheless precluded jurisdiction over claims emanating from that order. <u>Reguli</u>, 371 F. App'x at 597. This Court then found in <u>Cunningham</u> that "Plaintiff's argument that the state court was without jurisdiction does not undermine application of <u>Rooker-Feldman</u> to Plaintiff's claims based on the *Ex Parte* Order." <u>Cunningham</u>, 2020 WL 374413, at *5. Thus, it is of no moment whether Judge Collins may have exceeded his jurisdiction in issuing the *Ex Parte* Order. Under the <u>Rooker-Feldman</u> doctrine, all of the claims arising from the *Ex Parte* Order will be dismissed.[8]

---

[8] This results in the dismissal of all claims against Judge Collins. However, even if jurisdiction existed over any claims against Judge Collins, he would be entitled to absolute judicial immunity. <u>Cunningham</u>, 2020 WL 374413, at *6-7 (finding plaintiff's argument that *ex parte* order was entered without jurisdiction indicated, at most, judicial action in "excess of jurisdiction," not "in all absence of jurisdiction" as defined by governing authority, and concluding that the Juvenile Court judge who issued *ex parte* order was, in the alternative to application of <u>Rooker-Feldman</u>, entitled to absolute judicial immunity).

6. <u>Remaining Claims</u>

Several claims remain outside the scope of the *Ex Parte* Order. These include Hancock's: (a) Fourteenth Amendment claims against Keys Group and W. Miller for providing a toxic foster home environment; (b) Fourth Amendment claims against James Cornelius for his criminal investigation of Hancock; (c) policy or custom claims against Smithville, Tennessee; (d) First Amendment and Fourteenth Amendment claims against Hetzel and R. Williams related to the FCRB; and (e) Fourth Amendment, Fourteenth Amendment procedural and substantive due process, and First Amendment claims against D. Miller and Hetzel concerning actions taken in seeking the *Ex Parte* Order. All of these Defendants argue that they are entitled to dismissal of these claims or immunity from suit.

a. <u>Wendolyn Miller and Keys Group</u>

Hancock brings Section 1983 claims against Keys Group and its employee W. Miller for violating the Fourteenth Amendment by creating a "toxic" foster home environment.[9] Assuming, arguendo, that it is a state actor, Keys Group and W. Miller argue correctly that they are entitled to qualified immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982));

---

[9] Hancock concedes that her Section 1983 claims against W. Miller and Keys Group based upon other constitutional rights, including specifically the First Amendment, must be dismissed. (Doc. No. 88 at 6.) The Court agrees that Hancock has failed to plead a First Amendment retaliation claim because she did not allege that Keys Group or W. Miller took any adverse actions as a result of her protected speech. <u>See, e.g.</u>, <u>Boxill v. O'Grady</u>, 935 F.3d 510, 518 (6th Cir. 2019).

Goodwin v. City of Painesville, 781 F.3d 314, 320-21 (6th Cir. 2015). Private foster care agencies such as Keys Group, working under contract with and monitored by the state, may be entitled to qualified immunity. Bartell v. Lohiser, 215 F.3d 550, 557 (6th Cir. 2000). Here the Court addresses first whether a Hancock has alleged a violation of her Fourteenth Amendment rights.[10]

Substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." Guertin v. State, 912 F.3d 907, 918 (6th Cir. 2019) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). "It 'specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)). One of these fundamental rights is the right of a child "to be free from the infliction of unnecessary harm" while in a state-regulated foster home. Meador, 902 F.2d at 476.

"Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant." Guertin, 912 F.3d at 922 (citing Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 688 (6th Cir. 2011)). The court applies a "deliberate indifference" test to the alleged denial of this fundamental right. Lintz, 25 F.3d at 306; Moore v. Lake Cty. Dep't.

---

[10] To be clear, this is not a claim under the "state-created danger" exception, under which state officials may be found to have violated the substantive due process rights of people not within their custody "when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way." Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003). That path to liability requires an affirmative act by the state, and the types of failures to act alleged by Hancock are not affirmative acts under the state-created danger theory. See id. (citing Reed v. Knox County Dep't of Human Servs., 968 F. Supp. 1212, 1220-22 (S.D. Ohio 1997) (failing to remove child from foster home was not an affirmative act)); see also Jones v. Reynolds, 438 F.3d 685, 692 (6th Cir. 2006) (when state action or inaction does not affirmatively increase the risk of harm, the plaintiff cannot establish a cognizable state-created danger claim).

of Job & Family Servs., 364 F. App'x 194, 196 (6th Cir. 2010). As is well known, an allegation of negligence does not satisfy the deliberate indifference standard. See, e.g., Guertin, 912 F.3d at 923. Rather, Hancock must allege, at a minimum, something akin to recklessness. Id. Hancock misreads Meador and essentially contends that all she must plead is that Keys Group should have suspected unnecessary harm was inflicted upon the children. (See Doc. No. 88 at 9.) This is not the law, because it ignores the deliberate indifference requirement. Indeed, as one court has pointed out, Hancock's proposed weaker standard is unworkable because foster agencies must "respect the foster family's autonomy and integrity and . . . minimize intrusiveness, given [the] goal of approximating a normal family environment for foster children." Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 142 (2d Cir. 1981).

The question, therefore, is whether Hancock adequately alleges that either Keys Group or W. Miller was deliberately indifferent to reports or other knowledge of substandard conditions in the two homes of Keys Group foster parents. See, e.g., Meador, 902 F.2d at 476. Hancock does allege troubling conditions in the foster homes of Sneed and Williams. However, Hancock does not allege that Keys Group had notice of the conditions in either the Sneed or Williams house prior to B.B.'s placement. (See Doc. No. 34.) Further, according to Hancock's own allegations, on the two respective occasions that the children complained about the environment in these homes and put Keys Group on notice of their concerns about the conditions, the children were promptly relocated to new homes. According to the First Amended Complaint, Hancock's children complained about the conditions in the Sneed house on September 14, 2018. (Id. ¶¶ 66-67.) In response to those complaints, B.B. was relocated to a different foster home *on the same day*. (Id.) Similarly, according to the First Amended Complaint, the children began complaining about the Williams home one day after they arrived, approximately September 15, 2018. (Id. ¶ 67.) The

children were then allegedly relocated to a new (non-Keys Group) foster home by "mid-September." (Id. ¶ 72.) By any common understanding of the term "mid-September," this was *within days* of the complaint. These allegations do not support a plausible inference that Keys Group was deliberately indifferent to reports by B.B. of the substandard condition of her two Keys Group foster homes. Iqbal, 556 U.S. at 678; Lutz, 717 F.3d at 464. Keys Group is therefore entitled to qualified immunity on the Section 1983 substantive due process claim.

Hancock attempts to salvage the individual capacity Section 1983 claim[11] against W. Miller by pointing to the vague allegation that W. Miller "was aware" of the circumstances in the Sneed home. (Doc. No. 34 ¶ 66.) However, this non-specific reference does not nudge this claim "across the line from conceivable to plausible." Lutz, 717 F.3d at 464. Hancock does not allege *when* W. Miller became aware (i.e., how long before the children complained on September 14) or *what* W. Miller did or did not do with that information. This type of "unadorned, the-defendant-unlawfully-harmed-me accusation" is expressly disfavored by the Supreme Court. Iqbal, 556 U.S. at 678. Indeed, this allegation is located in the paragraph of the First Amended Complaint specifically describing the events that occurred on September 14, when the children complained and put Keys Group on notice. (See Doc. No. 34 ¶ 66.) There is no allegation in the First Amended Complaint that W. Miller was aware of the conditions *in* the Sneed home on a date prior to this time. (See Doc. No. 34.) The only other allegations concerning W. Miller concern two events

---

[11] The official capacity Section 1983 claim against W. Miller must be dismissed because she is an employee of a private, not public entity. See, e.g., Lester v. Extendicare, Inc., Civil Action No. 6:13-CV-21, 2013 WL 3781300, at *2-3 (E.D. Ky. July 18, 2013) (collecting cases and explaining that an official capacity claim is not sustainable "against the employee of a private entity"); Tran v. Michigan Dep't of Human Servs., Civil Action No. 07-CV-13232, 2007 WL 4326791, at *4 (E.D. Mich. Dec. 10, 2007) (approving recommendation that official capacity claim against officer of Orchard Children's Services, a private entity, must be dismissed because he was not a "state or local government employee").

*outside* of the Sneed home: that she attended a party with Sneed and the children at which "several adults" drank alcohol and smoked marijuana, and that she got a speeding ticket while driving with the children. (Id. ¶ 66.) The latter of these is irrelevant to the conditions in the Sneed home. While the former might have suggested to W. Miller that Sneed had questionable judgment, it is simply insufficient to support an allegation of deliberate indifference regarding conditions in the Sneed home. W. Miller is also entitled to qualified immunity.

The Court notes that Hancock also attempts to impose vicarious liability upon either Keys Group or W. Miller under Section 1983 for the actions of the foster parents. Of course, there is no vicarious liability under Section 1983, so Hancock purports to bring a claim for lack of training of foster parents. This claim must be dismissed for two reasons. First, it is unclear under what theory of constitutional liability Hancock brings this claim – she appears to conflate a common law negligence claim with a Section 1983 claim. Second, the claim is wholly unsupported. Hancock alleges no specific training failures by Keys Group or W. Miller and thus pleads a failure to train in only the most conclusory manner. This does not nudge the claim "across the line from conceivable to plausible." Lutz, 717 F.3d at 464. To the extent Hancock brings such a failure to train claim against these Defendants under Section 1983, it must be dismissed.

b.      Detective James Cornelius

Hancock brings Section 1983 claims against Detective Cornelius based upon violations of the Fourth Amendment. Both parties agree that one of these claims is for Cornelius' pinging of Hancock's cell phone. It is likely that this claim is precluded under Rooker-Feldman, as discussed above, because Cornelius was pursuing Hancock and her daughter pursuant to the *Ex Parte* Order at the time this occurred. However, Cornelius was also arguably pursuing Hancock pursuant to outstanding criminal warrants, which existed outside the direct confines of the *Ex Parte* Order. For

the sake of completeness, the Court therefore considers Cornelius' argument that he is entitled to qualified immunity on this claim.

Here, the Court addresses first whether Hancock alleges a violation of clearly established rights. "In inquiring whether a constitutional right is clearly established, [the Court] must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" Brown v. Battle Creek Police Dep't, 844 F.3d 556, 566–67 (6th Cir. 2016) (quoting Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir. 1993)). As the Court of Appeals recently summarized:

> To overcome qualified immunity, the clearly established law must be specific enough to put a reasonable officer on notice that the conduct at issue was unconstitutional. There need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional. Nevertheless, the relevant principles should be defined at a high degree of specificity, especially in the Fourth Amendment context. Because probable cause cannot be reduced to a neat set of legal rules and is incapable of precise definition or quantification, police officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered. Thus, in the Fourth Amendment context, while there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [search] beyond debate.

Hernandez v. Boles, 949 F.3d 251, 261 (6th Cir. 2020) (internal citations and quotation marks omitted).

The Sixth Circuit recognizes exigent circumstances as an exception to the warrant requirement. See, e.g., Morgan v. Fairfield Cty., Ohio, 903 F.3d 553, 563 (6th Cir. 2018). "Exigent circumstances are situations where real[,] immediate[,] and serious consequences will certainly occur if the police officer postpones action to obtain a warrant." Baker v. City of Trenton, 936 F.3d 523, 530 (6th Cir. 2019) (alterations in original) (citing Thacker v. City of Columbus, 328 F.3d 244, 253 (6th Cir. 2003)). Exigent circumstances typically involve either: "(1) hot pursuit of

a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." Id. (quoting United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996)). In Carpenter v. United States, 138 S. Ct. 2206 (2018), the leading case concerning access to cell-site location information ("CSLI"), the Supreme Court held that:

> [E]ven though the Government will generally need a warrant to access CSLI, case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances. One well recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment. Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence. As a result, if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI. . . . Our decision today does not call into doubt warrantless access to CSLI in such circumstances. While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set forth does not limit their ability to respond to an ongoing emergency.

Id. at 2222-23 (internal citations and quotation marks omitted). Thus, after Carpenter, exceptions for exigent circumstances continue to apply to searches of CSLI.

Here, DCS was granted emergency custody of B.B. in the *Ex Parte* Order after Judge Collins found a threat to B.B.'s safety, identified valid concerns that B.B. may be taken out of the jurisdiction, and verified an outstanding arrest warrant for Hancock, and an emergency alert was issued for Hancock and B.B.[12] In short, Cornelius was attempting to locate a missing individual charged with two crimes who was not only no longer allowed to be in possession of her minor

---

[12] Hancock's privacy claim for publishing images of her and B.B. during the emergency alert falls under state law. Lambert v. Hartman, 517 F.3d 433, (6th Cir. 2008) (holding that a county clerk did not violate plaintiff's substantive due process right to privacy by posting personal identifying information on a website for plaintiff's traffic citations); see also, e.g., ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 928 (6th Cir. 2003) (right of publicity); Agba v. The Commercial Appeal, No. 15-2289-JDT-dkv, 2015 WL 4935497, *3 (W.D. Tenn. July 30, 2015) (false light invasion of privacy claim).

child, but also feared to be a danger to that child. Based upon these exigent circumstances, Cornelius did not violate a clearly established right of Hancock. Specifically, in such an emergency situation, pinging Hancock's phone to obtain CSLI does not violate a clearly established right to be free from warrantless searches under the Fourth Amendment. What is determinative here is that Cornelius was not on notice that his action might be unconstitutional. Because Cornelius is not alleged to have violated Hancock's clearly established constitutional right, he is entitled to qualified immunity on this claim.

Hancock also brings Fourth Amendment claims against Cornelius for acting in concert with D. Miller in seizing her *son*, and for seizing her cell phone when it was possessed by her *son* in DCS custody. Cornelius is entitled to qualified immunity on these claims. An individual's Fourth Amendment right against unreasonable seizure of property is violated when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Karo, 468 U.S. 705, 712 (1984) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). However, because Fourth Amendment rights are personal, they turn on a party's "legitimate expectation of privacy in the place searched or the thing seized." United States v. Waller, 426 F.3d 838, 843 (6th Cir. 2005) (quoting United States v. King, 227 F.3d 732, 743 (6th Cir. 2000)); see also Byrd v. United States, 138 S. Ct. 1518, 1526 (2018). "A person who is aggrieved by an illegal search and seizure only through . . . damaging evidence secured by a search of a third person has not had any of his Fourth Amendment rights infringed." Rakas v. Illinois, 439 U.S. 128, 134 (1978) (citing Alderman v. United States, 394 U.S. 165, 174 (1969)). Moreover, "expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Byrd, 138 S. Ct. at 1527 (quoting Rakas, 439 U.S. at 144 n.12.) Thus, the Supreme Court has

highlighted two circumstances that will demonstrate a legitimate expectation of privacy: the right to exclude others and lawful possession or control. Id. at 1527-28. When Cornelius seized Hancock's phone it was in the possession and control of her son. (See Doc. No. 34 ¶ 61.) Further, she has not alleged any facts to suggest that she was excluding others from use of the phone. Because Hancock alleges only that Cornelius seized property from her son, she has not alleged that Cornelius has violated her Fourth Amendment rights. Further, Hancock has articulated no clearly established right to not have her phone seized from a third party. Accordingly, Cornelius is also entitled to qualified immunity on these claims.

c.      Smithville, Tennessee

Hancock alleges "custom and practice" and "failure to train" theories of liability against Smithville. (Doc. No. 89 at 10-11.) Smithville contends both theories are flawed. There is no *respondeat superior* liability under Section 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A plaintiff raising a municipal liability claim under Section 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. Id. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013) (citing Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)).

Hancock argues that she has pled two of these four theories of liability. Hancock first contends that she pleads the existence of a custom of tolerance or acquiescence of federal rights violations – namely, "engaging in coordination with DCS to remove children from homes while

violating the Fourth and Fifth Amendment rights of citizens." (Doc. No. 89 at 10.) However, "a custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims." Burgess, 735 F.3d at 478 (citing Thomas, 398 F.3d at 433; Leach v. Shelby Cty. Sheriff, 891 F.2d 1241, 1248 (6th Cir. 1989)). Hancock has not alleged any prior instances of similar misconduct or any alleged pattern of inadequate investigation of similar claims.

Hancock next contends that she has pled a failure to train theory of municipal liability concerning "the Fourth and Fifth Amendment rights of citizens." (Doc. No. 89 at 10.) Inadequate training may serve as the basis for Section 1983 liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). In order to impose liability, a plaintiff must show "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." Brown v. Chapman, 814 F.3d 447, 464 (6th Cir. 2016) (alterations in original) (quoting Plinton v. Cty. of Summit, 540 F.3d 459, 464 (6th Cir. 2008)). However, "a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established." Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012). As discussed above, the Court will dismiss the Fifth Amendment claims against Holmes and Cornelius and the Fourth Amendment claims against Cornelius related to the seizure of Hancock's son. Further, the Court will grant Cornelius qualified immunity on Hancock's Fourth Amendment claims concerning the cell phone ping and the seizure of Hancock's phone from her son, on grounds that neither claim involved a clearly-established right. Accordingly, there is no predicate clearly-established

constitutional right concerning which Smithville's training can have been deliberately indifferent. Id. Smithville, Tennessee will be dismissed.

d.     R. Williams and Hetzel

Hancock brings Section 1983 claims against R. Williams[13] and Hetzel for violating her Fourteenth Amendment substantive and procedural due process rights in connection with the FCRB, and against R. Williams for violating her First Amendment rights by requiring Hancock to sign a confidentiality statement in order to participate in FCRB meetings. These Defendants argue they are entitled to qualified immunity.

i.     Fourteenth Amendment Procedural and Substantive Due Process Claims

For a Fourteenth Amendment procedural due process claim, a plaintiff must plead "(1) [s]he had a life, liberty, or property interest protected by the Due Process Clause; (2) [s]he was deprived of this protected interest; and (3) the state did not afford h[er] adequate procedural rights prior to depriving h[er] of the . . . interest." Jasinski v. Tyler, 729 F.3d 531, 541 (6th Cir. 2013) (quoting Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006)). Only after meeting the "protected interest" requirement can a plaintiff prevail by showing that such interest was abridged without appropriate process. Tony L. By & Through Simpson v. Childers, 71 F.3d 1182, 1185 (6th Cir. 1995). As relevant here, a liberty interest[14] may be created by state law when a state places "substantive limitations on official discretion." Id. (quoting Olim v. Wakinekona,

---

[13] R. Williams argues at length that Hancock has not alleged that he is a state actor. While there is no direct authority on this point, the FCRB is created by statute and appointed by Juvenile Court, and it has certain statutory duties and privileges. See Tenn. Code Ann. § 37-2-406. Further, R. Williams is himself only an FCRB member by virtue of being a juvenile probation official. Accordingly, the Court assumes for purposes of this analysis that R. Williams is sufficiently alleged to have been a state actor for purposes of the Section 1983 claim.

[14] Hancock does not allege deprivation of a life or property interest.

461 U.S. 238, 249 (1983)). A state may create such limitations "by establishing 'substantive predicates' to govern official decision-making . . . and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." Id. (quoting Olim, 461 U.S. at 249). The state statute "must use 'explicitly mandatory language' requiring a particular outcome if the articulated substantive predicates are present." Id. (quoting Olim, 461 U.S. at 249). For example, in Tony L., the Sixth Circuit held that a Kentucky statute that provided "[u]pon receipt of a report of an abused, neglected or dependent child . . . the designated agency . . . shall initiate a prompt investigation, take necessary action and shall offer protective services toward safeguarding the welfare of the child," had "failed to create a liberty interest because it did not mandate any particular substantive outcome." Id. at 1185. Thus, the key question is whether the governing state law "sufficiently mandates a particular substantive outcome, or whether it merely provides an expectation of receiving certain process." Jasinski, 729 F.3d at 542.

Under Tennessee law, the FCRB is an "advisory review board" appointed by the Juvenile Court to assist it in conducting a periodic review of foster care placements. Tenn. Code. Ann. § 37-2-406. Specifically, the statute provides only that the FCRB must "conduct the [foster care placement] reviews" no less frequently than "ninety (90) days after placement in foster care and every six (6) months thereafter" with certain exceptions. Id. The law requires that "[n]otice of this review and the right to attend and participate in the review shall be provided to the child's parent(s) whose rights have not been terminated or surrendered, the parent's attorney, the guardian *ad litem* and/or attorney for the child, foster parents, prospective adoptive parent, relatives providing care for the child and the child who is a party to the proceeding." Id. § 37-2-404(b). The scope of the FCRB's review is defined as follows: "[t]he court or board shall review the safety, permanency and wellbeing of the child by assessing the necessity and appropriateness of continued foster care

placement, the appropriateness of services for the child, the compliance of all parties to the statement of responsibilities, the extent of progress in alleviating or mitigating the causes necessitating placement in foster care and in achieving the goals contained in the permanency plan, and project a likely date on which the goal of the plan will be achieved." Id.

The statutes creating the FCRB do *not* provide for a particular substantive outcome. Rather, the FCRB is given discretion to develop its own procedures, conduct its own reviews, and make the reports and recommendations to the juvenile court that it deems appropriate. Indeed, the only arguably substantive requirement is that the FCRB take proactive steps to maintain confidentiality, which is what Hancock actually alleges violated her due process rights.[15] Accordingly, Tennessee law only provides an expectation of participation in FCRB meetings to Hancock, and does not create a *liberty* interest enforceable under the Due Process Clause of the Fourteenth Amendment. Thus, Hancock has not alleged that Hetzel or R. Williams violated her Fourteenth Amendment procedural due process rights.

As discussed above, substantive due process under the Fourteenth Amendment affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental. Guertin, 912 F.3d at 918; In re City of Detroit, 841 F.3d 684, 699 (6th Cir. 2016). Parents have a fundamental liberty interest "in the care, custody, and management of their child."[16]

---

[15] To be clear, to the extent that Hancock alleges that the FCRB missed certain reporting deadlines, "a 'mere error of state law' is not a denial of [procedural] due process." Swarthout v. Cooke, 562 U.S. 216, 222 (2011) (quoting Engle v. Isaac, 456 U.S. 107, 121 n.21 (1982)).

[16] It is not entirely clear whether Hancock's substantive due process claim concerning participation in FCRB meetings subject to confidentiality rules arises under this interest or the state statutes described above. If it is state statutes, Hancock has not pled a violation because for purposes of substantive due process, "[r]ights derived from state law, as opposed to the constitution, usually do not make the cut." In re City of Detroit, 841 F.3d at 699. Hancock has not offered authority to suggest otherwise in these circumstances.

<u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982). Here, Hancock has offered no authority that there is a *fundamental* right under the constitution to participate in FCRB meetings without complying with the FCRB's discretionary procedures or agreeing to discretionary measures to implement statutory confidentiality requirements. Hancock has also not alleged that Hetzel or R. Williams, who as FCRB members were charged with reviewing B.B.'s foster home placements, were deliberately indifferent – as opposed to negligent – to any excessive risk to the health or safety of B.B. in foster care. <u>See</u> <u>Meador</u>, 902 F.2d at 476.

Because Hancock has not alleged a violation of her Fourteenth Amendment rights, Hetzel and R. Williams are entitled to qualified immunity on these FCRB-related claims, and each will be dismissed.

ii. <u>First Amendment Retaliation Claims</u>

To sustain a Section 1983 claim for First Amendment retaliation, Hancock must plead that: "(1) [s]he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against h[er] that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by his protected conduct." <u>Dye v. Office of the Racing Comm'n</u>, 702 F.3d 286, 294 (6th Cir. 2012) (quoting <u>Scarbrough v. Morgan Cty. Bd. of Educ.</u>, 470 F.3d 250, 255 (6th Cir. 2006)). As discussed above, Hancock engaged in protected speech. She alleges that R. Williams was aware of that speech and "outrag[ed]" by it, and that he attempted to exclude Hancock from FCRB meetings by means of the confidentiality requirements to "silence" her from "publicly disclosing the continued abuses and incompetency of DCS." (Doc. No. 34 ¶¶ 95, 99.) While very bare-bones, the Court will assume that Hancock has sufficiently alleged this constitutional violation.

However, Hancock has advanced no authority (or even argument) for the proposition that it was clearly established that she had the right to attend FCRB meetings free of any confidentiality requirements imposed by the board. In particular because Tennessee law imposes upon the FCRB confidentiality requirements under criminal penalty, see Tenn. Code Ann. § 37-2-408, the Court cannot say that existing precedent placed beyond debate the lawfulness of R. Williams' conditioning Hancock's participation on a stipulation to confidentiality. Because R. Williams is not alleged to have violated a right that was "clearly established at the time of the challenged conduct," al-Kidd, 563 U.S. at 735, he is entitled to qualified immunity on this First Amendment claim.

e.      Hetzel, Brown and D. Miller

Hancock makes a number of allegations concerning the actions taken by Hetzel, in her capacity as DCS attorney, D. Miller, in her capacity as DCS caseworker, and Brown, in her capacity as DCS Family Services Worker, in their investigation and petition for the *Ex Parte* Order. These claims are conceptually related to the *Ex Parte* Order, but they concern events that occurred prior to it being entered by Judge Collins, and, thus, they are not precluded by the Rooker-Feldman doctrine. Specifically, Hancock alleges that Hetzel and Miller (a) made false or misleading claims in the petition for the *Ex Parte* Order; (b) took the petition to Judge Collins (rather than Judge Cook) in bad faith; (c) failed to properly communicate with Reguli when initiating the petition; (d) initiated the removal proceedings as retaliation against Hancock for her protected speech and use of an "activist attorney"; (e) withheld exculpatory evidence when advancing the petition; and (f) improperly controlled Hancock's son in the days prior to the entry of the *Ex Parte* Order. (See Doc. No. 93 at 24-35.)

The Supreme Court has extended to prosecutors absolute immunity from a suit for damages under Section 1983 when the activity involved is "intimately associated with the judicial phase of the criminal process." Cunningham, 2020 WL 374413, at *7 (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). As the Sixth Circuit has summarized:

> As the doctrine has emerged, absolute prosecutorial immunity protects only those acts falling within a prosecutor's role as advocate for the state and intimately associated with the judicial process, and not for administrative or investigative acts antecedent or extraneous to the judicial process. Investigative acts undertaken in direct preparation of judicial proceedings, including the professional evaluation of evidence, warrant absolute immunity, whereas other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection.

Ireland v. Tunis, 113 F.3d 1435, 1445 (6th Cir. 1997) (citing Buckley v. Fitzsimmons, 509 U.S. 259 (1993)). For example, "[a] prosecutor was therefore absolutely immune from suit for soliciting false testimony from witnesses and participating in a probable cause hearing that led to the issuance of a search warrant, but not for giving legal advice to the police regarding the use of hypnosis as an investigative technique and the existence of probable cause to arrest." Id. at 1445. For these latter type of actions, the prosecutor may only claim qualified immunity. Id.; Cunningham, 2020 WL 374413, at *7.

DCS social workers (or family service/case workers) are entitled to immunity "akin to the scope of prosecutorial immunity." Pittman v. Cuyahoga Co. Dep't of Children & Family Servs., 640 F.3d 716, 724 (6th Cir. 2011) (quoting Imbler, 424 U.S. at 430); Brent, 901 F.3d at 683-84; Cunningham, 2020 WL 374413, at *7; Turner v. Lowen, No. 3:18-cv-00721, 2019 WL 4820519, at *4 (M.D. Tenn. Oct. 1, 2019). This immunity applies "only when [social workers] are acting in their capacity as legal advocates – initiating court actions or testifying under oath – not when they are performing administrative, investigative, or other functions." Pittman, 640 F.3d at 724

(emphasis omitted); Holloway v. Brush, 220 F.3d 767, 775 (6th Cir. 2000) (en banc). The immunity extends to "fail[ure] to conduct a careful investigation before incorporating . . . false accusations in [a child abuse] petition," Pittman, 640 F.3d at 726 (alteration in original) (quoting Rippy ex rel. Rippy v. Hattaway, 270 F.3d 416, 421 (6th Cir. 2001)), and it applies "even if social workers make knowingly false statements in the petition for a removal order and while advocating before the court," Brent, 901 F.3d at 684 (citing Pittman, 640 F.3d at 725-26); see also Turner, 2019 WL 4820519, at *4. Indeed, the Sixth Circuit has explained that the function of making recommendations to the juvenile court *including the underlying investigation,* is . . . intimately related to the judicial phase of child custody proceedings and therefore protected by absolute immunity." Pittman, 640 F.3d at 726 (emphasis in original) (internal quotation marks and citation omitted). Conferring absolute immunity on child advocates "represents 'a balance between . . . evils,' as 'it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" Bauch v. Richland Cty. Children Servs., 733 F. App'x 292, 297 (6th Cir. 2018) (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)).[17]

In particular, the Sixth Circuit has held on multiple occasions "that the submission of an affidavit that triggers judicial child-removal proceedings is in fact an act of legal advocacy by social workers." Bauch, 773 F. App'x at 296 (citing Barber v. Miller, 809 F.3d 840, 843 (6th Cir. 2015)). In Barber, a father alleged that a social worker included falsehoods and misrepresentations

---

[17] Hancock's reliance on Young v. Vega, 574 F. App'x 684 (6th Cir. 2014), for a contrary proposition is unavailing. As our court observed in Turner, the Sixth Circuit has explained that Young is no longer good law. See Turner, 2019 WL 4820519, at *5 (citing Bauch, 733 F. App'x at 297). Likewise, Hancock's reference to the Child Abuse Prevention and Treatment Act, is of no assistance, as the relevant section of that law, 42 U.S.C. § 671(a)(15), does not provide a basis for a right of action under Section 1983. See Tony L., 71 F.3d at 1189; Brian A. ex rel. Brooks v Sundquist, 149 F. Supp. 2d 941, 946 (M.D. Tenn. 2000).

in a petition for protective custody in order to obtain an *ex parte* order for immediate removal of his child. 809 F.3d at 843. The Sixth Circuit held that the social worker was entitled to absolute immunity against those allegations because the social worker "offered his factual assessment in his capacity as a legal advocate initiating a child-custody proceeding in family court." Id. at 843-44. The court explained that "[a] social worker acts as a legal advocate when initiating court proceedings, filing child-abuse complaints, and testifying under oath," and that "this absolute immunity holds, even under allegations that the social worker intentionally misrepresented facts to the family court." Id. at 844; see also Schattilly v. Daugharty, 656 F. App'x 123, 135 (6th Cir. 2016) ("[Absolute] immunity includes social workers' statements in complaints or affidavits that they submit to courts – even if the statements are false or misleading." (citing Pittman, 640 F.3d at 724-25)).

Thus, in Cunningham, Judge William L. Campbell, Jr. recently ruled that a DCS attorney and DCS caseworker were entitled to absolute immunity for claims that they "conducted an inadequate investigation and made false statements in their [v]erified [a]pplication for [an] *[e]x [p]arte* [o]rder," regardless of whether they acted outside of their jurisdiction. Cunningham, 2020 WL 374413, at *7-8. Similarly, in Turner, Judge Eli Richardson recently ruled that a DCS social worker was entitled to absolute immunity for actions taken as a "legal advocate" in connection with filing a juvenile court petition for removal of a child from the custody of his parents, regardless of whether or not the social worker withheld exculpatory evidence. Turner, 2019 WL 4820519, at *5. So too here. Both Hetzel and D. Miller engaged in legal advocacy when they investigated, prepared, presented, and offered evidence in support of the DCS removal petition that resulted in the *Ex Parte* Order. They are therefore entitled to absolute immunity for their acts regardless of whether they made false statements, material omissions, withheld exculpatory

evidence, or acted outside of their jurisdiction by taking the petition to Judge Collins.[18] Brent, 901

F.3d at 684; Bauch, 773 F. App'x at 296; Pittman, 640 F.3d at 725-26; Cunningham, 2020 WL

374413, at *7-8; Turner, 2019 WL 4820519, at *5.

This conclusion resolves all of Hancock's remaining claims against Hetzel and D. Miller,

except the claim that D. Miller improperly controlled Hancock's son in violation of Fourteenth

Amendment procedural and substantive due process rights.[19] Hancock alleges that: (a) on August

6, 2018, D. Miller filed an unruly petition against her son; (b) on August 7, 2018, her son left her

home disgruntled; (c) on August 8, she reported her son missing to the Smithville Police; (d) her

son's father had control over her son and brought him to DCS on August 10, 2018; (e) the father

tested positive for drugs; (f) at that time, DCS took possession of her son; (g) that same day,

Detective Cornelius called Hancock and told her he had some "important information on her son,"

and she needed to come to the police station; (h) Reguli asked about Hancock's son, but Cornelius

declined to provide her with any information and told her that Hancock needed to come in to

discuss the matter; (i) also on August 10 (a Friday), DCS began contacting the juvenile court

regarding filing a petition for an *ex parte* order; (h) on Monday, August 13, DCS went before

---

[18] To be clear, to the extent any of Hancock's claims concern the *execution* of the *Ex Parte* Order and not the petition for it, the absolute immunity analysis would not apply. Cunningham, 2020 WL 374413, at *8. Rather, a qualified immunity analysis would apply. Id. As discussed above, these claims are precluded under the Rooker-Feldman doctrine. However, for the sake of completeness, were any "execution" claims to survive Rooker-Feldman, Hetzel, Brown and D. Miller would be entitled to qualified immunity. See id. (explaining that as recently as 2015, the Sixth Circuit held that general assertions that constitutional rights were violated when a child is seized pursuant to an order – even when the order is allegedly based on false statements or otherwise lacked probable cause – did not invoke a clearly established right) (citing Brent, 901 F.3d at 685; Barber, 809 F.3d at 848).

[19] Hancock also suggests that the seizure of her son violated *her* Fourth Amendment rights, but of course this cannot be, because Hancock was not searched or seized. As discussed above, Fourth Amendment rights are personal and cannot be vicariously asserted. Rakas, 439 U.S. at 134. Any such claim will be dismissed as inadequately pled.

Judge Collins and the *Ex Parte* Order for state custody of Hancock's children was issued. (Doc. No. 34 ¶¶ 37-51.) As a practical matter, it is fundamentally inconsistent for Hancock to have sought the help of the state regarding her unruly, missing son, on the one hand, and now to claim that the state violated her rights when it took rapid steps to protect her son when it found him. Regardless, Hancock has not alleged a constitutional violation.

As mentioned, the Supreme Court has recognized a liberty interest in family integrity. This includes an interest in "preventing erroneous termination of the[ parent-child] relationship." Santosky, 455 U.S. at 760; see also Kovacic v. Cuyahoga Cty. Dep't of Children and Family Servs., 724 F.3d 687, 700 (6th Cir. 2013) (affirming the due process right to the maintenance of a parent-child relationship) (citing Teets v. Cuyahoga Cty., 460 F. App'x 498, 501 (6th Cir. 2012); Kottmyer v. Maas, 436 F.3d 684, 689 (6th Cir. 2006)). Because of a parent's fundamental liberty interest in the custody of his or her child, "state intervention in the relationship between a parent and child must be accomplished by procedures meeting the requisites of the Due Process Clause." Eidson v. Tenn. Dep't of Children's Servs., 510 F.3d 631, 635 (6th Cir. 2007). Thus, even for temporary deprivations of custodial rights, parents are generally entitled to a hearing "within a reasonable time." Id. Here, Hancock alleges that the DCS petition was presented to the court within one business day of DCS taking custody of Hancock's son. In the *Ex Parte* Order, the court set a prompt hearing which, in fact, occurred, although Hancock and B.B. were not located by DCS and law enforcement for some days.[20] More hearings, of course, followed those developments. Thus, Hancock has not alleged a violation of Fourteenth Amendment procedural due process by D. Miller in connection with DCS taking custody of her son.

---

[20] Indeed, delay in Hancock asserting her rights in Court can reasonably be attributed to certain choices made by Hancock (and perhaps her counsel) in the wake of the *Ex Parte* Order.

Nor has Hancock alleged a plausible Fourteenth Amendment substantive due process claim. Substantive due process claims come in two varieties: "(1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience." Pittman, 640 F.3d at 728 (citations omitted). Here, Hancock alleges that D. Miller took possession of her unruly and reported-missing son from another parent who tested positive for drugs on a Friday; *the same day* began contacting Hancock to come in to discuss her son, and *the same day* began preparing a petition for an *ex parte* order for state custody, which DCS presented to the court on *the next business day*. Hancock does not contend that these alleged actions "shock the conscience," and they do not. Guertin, 912 F.3d at 923-25 (explaining that conscience-shocking behavior must rise above "simply making bad choices").

For the other type of claim, substantive due process provides that "government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." Pittman, 640 F.3d at 729 (quoting Bartell, 215 F.3d at 557-58). Hancock has not pled this type of violation either. First, D. Miller cannot be individually liable for depriving Hancock of her fundamental right to family integrity because that deprivation was perpetrated by DCS, not D. Miller. (See Doc. No. 34 ¶ 44 (alleging that "*DCS* took possession of Hancock's son on August 10") (emphasis added)). Second, even if D. Miller could be considered individually responsible for DCS' taking control of Hancock's son, DCS, as alleged, did so only as a temporary, emergency basis, and immediately began attempts to contact Hancock and petition the court for a formal decision on the matter. "Because the [ ] court has the ultimate decision-making power with respect to placement and custody, *it alone* could deprive [Hancock] of [her] fundamental right" to family integrity. Pittman, 640 F.3d at 729 (emphasis added). Indeed, if social workers could be

held liable for violations of fundamental rights every time DCS took temporary custody of a child, the child welfare system would be turned upside down.

Accordingly, D. Miller is entitled to qualified immunity on these claims.

C.      Declaratory Relief

Hancock seeks a "declaratory judgment" that the *Ex Parte* Order violates her Fourth Amendment and Fourteenth Amendment procedural and substantive due process rights; is void due to lack of jurisdiction or judicial authority; and is void due to *ex parte* communications. (Doc. No. 34 at 50-51.)

"Declaratory judgment, however, is not a cause of action, but a specific type of relief. In order for the plaintiffs to be entitled to declaratory judgment, they must first succeed on a cognizable cause of action." Duncan v. Tenn. Valley Auth. Ret. Sys., 123 F. Supp. 3d 972, 982 (M.D. Tenn. 2015); see also Davis v. United States, 499 F.3d 590, 594 (6th Cir. 2007) (explaining that the Declaratory Judgement Act does not create an independent cause of action and therefore a federal court "must have jurisdiction already under some other federal statute" before a plaintiff can "invok[e] the Act."). All of the subjects for which Hancock seeks a declaratory judgment pertain to the *Ex Parte* Order, and thus pertain to claims over which the Court is precluded from exercising jurisdiction pursuant to the Rooker-Feldman doctrine. Indeed, the First Amended Complaint explicitly compels this conclusion, as it specifies that Hancock seeks the declaratory judgment invalidating the *Ex Parte* Order so that she may use it to her benefit in state court proceedings – *precisely* the enterprise Rooker-Feldman prohibits this Court from joining. (See Doc. No. 34 at 51.) Accordingly, there is no remaining, independent basis in federal law for the declaratory judgment that Hancock seeks. This claim for relief will therefore be dismissed along with Hancock's substantive federal claims.

D.  State Law Claims

The Court may decline to exercise supplemental jurisdiction over a state law claim if it dismisses "all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" Gamel v. City of Cincinnati, 625 F.3d 949, 951 (6th Cir. 2010) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). The Sixth Circuit has explained that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." Id. at 952 (quoting Musson Theatrical, Inc. v. Fed. Exp. Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996)). Hancock's state law claims are of the type that that Tennessee courts routinely and skillfully consider. These claims require consideration of the actions of Tennessee state and local officials and concern the operation of the Tennessee court system and child welfare system, matters of which the Tennessee courts are particularly well-versed. Fairness and comity therefore dictate that the Tennessee courts should be given the opportunity to decide these claims. After weighing the relevant factors, the Court does not find any reason to depart from the general rule, and therefore declines to retain supplemental jurisdiction over Hancock's state law claims.

IV.  Conclusion

Hancock has no viable federal claims. Easter Williams will be dismissed for lack of service. Hancock's Motions to Exclude Exhibits will be denied, and Defendants Collins, County of Smith, and Williams' Motion to Allow Substitution of Exhibit will be granted. The five Motions to Dismiss will be granted in part and denied in part, as follows: (a) all federal claims arising from the *Ex Parte* Order will be dismissed for lack of jurisdiction under the Rooker-Feldman doctrine;

and (b) all other federal claims will be dismissed on substantive or immunity grounds. The Court will decline to exercise supplemental jurisdiction over Hancock's state law claims.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE